C. F. ROLLINS, Plaintiff,

v.

PROCTOR & SCHWARTZ and SCM Corporation, Defendants.

Civ. A. No. 77–1835.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 24, 1979.

**4.** See, *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978), for a discussion of causal connection and proximate cause.

John E. Parker, Hampton, S. C., for plaintiff.

John P. Linton, Charleston, S. C., for defendants.

## ORDER

BLATT, District Judge.

Plaintiff, a resident of Georgia, was badly injured on May 10, 1972, when he was pulled into textile machinery in a plant located in the state of Georgia, which machinery had been manufactured by defendant, Proctor & Schwartz, a Pennsylvania corporation. He originally brought suit on September 12, 1977, against Proctor & Schwartz, amending his complaint to add defendant, SCM Corporation, on January 23, 1978. The defendants have filed a motion to dismiss, which motion raises the following questions:

1. Does Proctor & Schwartz directly "do business" in South Carolina so as to be subject to suit on a foreign cause of action under S.C.Code § 36–2–802?

2. May the activities of SCM Corporation, admittedly "doing business" in South Carolina, be imputed to Proctor & Schwartz *via* an "alter-ego" theory, to subject Proctor & Schwartz to suit on a foreign cause of action under S.C.Code § 36–2–802?

3. If jurisdiction is proper under either of the above theories, is venue proper?

4. If Proctor & Schwartz is "doing business" here under either or both of the above theories, does S.C.Code § 15–5–150, the "door closing statute", bar suit in this court?

5. Does the Georgia two-year statute of limitations bar the action in this court?

6. If personal jurisdiction does not exist in South Carolina, should this court trans-

fer this action to the Northern District of Georgia?

## THE DIRECT ACTIVITIES OF PROCTOR & SCHWARTZ

■ The courts have recognized that, in order to fairly hold a defendant amenable to suit in a given jurisdiction, it is necessary to analyze the contacts of both the plaintiff and defendant with the forum. The cases have developed a sliding scale for evaluating defendant's contacts with the locus of suit, which scale ranges from those cases requiring a single contact—(resident plaintiff, injury in forum)—to those requiring substantial contacts arising to the level of "doing business" as opposed to "transacting any business"—(nonresident plaintiff, injury outside of forum). The instant case is a "doing business" situation, because neither the plaintiff nor the defendants are residents of South Carolina, nor did the cause of action arise here. Plaintiff is apparently suing here because of the relatively long—(six-year)—South Carolina statute of limitations (S.C.Code § 15–3–530(5)); however, this fact, while it understandably provides defense counsel cause for protest, should not serve alone to bar this suit if South Carolina is determined to be "a major center of defendant's business" or "a community into whose business life the defendant [has] significantly entered as determined by the quality, substantially, continuity, and systematic nature of its activities," *Seymour v. Parke, Davis & Co.,* 423 F.2d 584, 587 (1st Cir. 1970), quoted with approval in *Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d

745, 748 (4th Cir. 1971). In making this determination, the court is mindful that, as numerous courts have recognized, precedent is a guide which must be scrutinized carefully on this question because it is apparent that, in judging each unique situation, "in the facts will the answer be found." No court, well versed in these matters, would contend that the dividing line is clear; on the contrary, most of the litigated questions in this area lie outside the certain, somewhere within the penumbra of probability. When the fact pattern at bar shades toward that of a decided case, such case can be consulted for guidance, but not dogma, unless the two factual patterns are wholly coincident. With these thoughts in mind, the court examines defendant, Proctor & Schwartz's, activities in this forum.

■ It is interesting to note, at the outset, that Proctor & Schwartz closed a plant in Rock Hill, South Carolina, which it had operated for over ten (10) years, just five (5) months before this cause of action arose in May, 1972. Had this plant been operating at the time of the plaintiff's injury, the court could readily find that Proctor & Schwartz had so injected itself into the community and affairs of this state that notions of fundamental fairness would not be offended by holding it to be "doing business" here;[1] and the fact that a corporation, which is doing business when the cause of action arises, withdraws or lessens its contacts with the state before suit is filed, will not defeat jurisdiction. *Snyder v. Eastern Auto Distributors, Inc.,* 357 F.2d 552, 556 (4th Cir. 1966).[2]

1. The relevant South Carolina statutory authority for subjecting a corporation to jurisdiction on a foreign cause of action is found in South Carolina Code § 36–2–802:

"A court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, doing business, or maintaining his or its principal place of business in, this state as to any cause of action."

Once it is decided that the state statute reaches the activities of the defendant—(a state law question)—then the court must determine whether such coverage violates federal law. *See, Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 747 n. 3 (4th Cir. 1971).

2. In *Snyder,* a Virginia corporation—(Eastern) —operated a foreign car distributorship in South Carolina for seven years, and was so engaged when it terminated its dealer—(Snyder)—but not when Snyder filed suit. The district court dismissed the action for lack of jurisdiction but the Court of Appeals reversed, "believing the service good," 357 F.2d at 553. In so doing, the court said:

". . . we cannot join in the District Judge's understanding that Eastern must have been found or doing business in South Carolina *on the day of service,* The focal time in determining whether Eastern is subject to the Court's jurisdiction and whether

■ The court has expanded the record in this case beyond the pleadings and, accordingly, after proper notice to the parties, has considered the record as presented as a motion for summary judgment on jurisdictional and other grounds. (F.R.C.P. 12(b)). The facts relevant to the direct activity of Proctor & Schwartz in South Carolina follow. Proctor & Schwartz has made substantial sales in South Carolina to more than one hundred South Carolina factories over the past several years itemized as follows: 1973—$1,418,752.00; 1974—$1,056,480.00; 1975—$865,931.00; 1976—$1,463,750.00; 1977—$572,528.00; 1978—$550,102.00. These sales are certainly not "insubstantial".[3] Proctor & Schwartz employs at least three, and possibly five salesmen who service South Carolina,[4] one of whom lives in the state, works forty weeks a year here, and operates his Proctor & Schwartz office out of his home in this state, using a Proctor & Schwartz leased automobile; however, these salesmen do not "close" sales in this state, but they transmit "orders" to Proctor & Schwartz in Pennsylvania for final acceptance. Proctor & Schwartz advertises in at least one South Carolina telephone directory, listing the home of its South Carolina resident sales-

man as its telephone number, and it pays for an answering service for that number. Proctor & Schwartz exhibits and advertises at the Textile Show held annually in Greenville, South Carolina, and, during 1974–1975, it had a distributor—(Hayes Textiles)—in Spartanburg, South Carolina, which sold one Proctor & Schwartz machine in this state. Proctor & Schwartz had entered into a contract, cancelled on December 31, 1977, with a South Carolina company for overseas advertising; it also owns a small amount—(two filing cabinets)—of personal property here. In addition, the district sales manager for this defendant's Southeastern Sales Division, C. W. Schwartz—(one of the original Schwartz family)—has visited South Carolina plants on several occasions to conduct price negotiations for sales arranged by the aforementioned salesmen.

Against this quantum of community involvement, the defendants produced the following facts: Proctor & Schwartz owns no property—(except as noted above)—in South Carolina, maintains no bank accounts here, has no South Carolina agent for service of process, is not registered to do business here, and does not—(except for the telephone directory listing)—advertise

venue is proper is *when the cause of action arose." Id.* at 556.

The court pointed out that it would be improper to allow a corporation to avoid suit in the state by withdrawal after an action arose against it in the state, and this court sees no reason not to apply the same rationale to the situation where a corporation is "doing business" in the state on the date an action arises elsewhere. As long as suit is instituted within a reasonable time—(which the Legislature of South Carolina has determined to be six years —S.C.Code § 15–3–530(5))—a foreign corporation should not defeat jurisdiction by withdrawal from the state before suit is filed. Of course, the opinion in *Snyder* dealt only with a withdrawal, leaving no contacts in the state at the time suit was filed; it does not bar a court from looking to those contacts which exist during the period of time after the cause of action arises and before, or contemporaneous with, the filing of suit, in order to determine if a corporation has sufficiently injected itself into the community's affairs so that defense of a foreign cause of action would not be unfair.

See also, *Wescott-Alexander, Inc. v. Dailey,* 264 F.2d 853, 861 (4th Cir. 1959):
"Such reduction of activity in the state, or a partial withdrawal from it, after the cause of action has arisen, does not defeat the jurisdiction power of the state."

3. The Court of Appeals for the Fourth Circuit said in *Lee v. Walworth Valve Co.,* 482 F.2d 297, 299 (4th Cir. 1973):
"sales of pumps aggregating several hundred thousand [never more than $400,000.00] dollars a year cannot be labeled insubstantial." The substantiality of the sales of Proctor & Schwartz in South Carolina is further indicated by the fact that of the forty-seven states in which Proctor & Schwartz sold equipment in 1976, 1977, and 1978, South Carolina was its # 2 state in sales volume in 1976 and its # 10 state in 1977 and 1978. These facts representing comparisons for the only years available in the record further indicate that Proctor & Schwartz has adopted this state as one of its major centers of business activity.

4. The record is conflicting on this point.

locally in South Carolina, although it does advertise in magazines which may make their way into South Carolina.

The parties are in agreement that the decisions of the Fourth Circuit Court of Appeals, most notably *Lee v. Walworth Valve Co.,* 482 F.2d 297 (4th Cir. 1973), and *Ratliff v. Cooper Laboratories,* 444 F.2d 745 (4th Cir. 1971), shape the contours of the contacts analysis to be undertaken here. For that reason, a review of the community involvement recited in those cases is useful. In *Ratliff,* non-resident plaintiffs sought to hold two foreign corporations in consolidated actions on causes of action arising from injuries allegedly induced by drugs manufactured and ingested outside South Carolina. The court had no difficulty holding that defendant, Cooper Laboratories, was not amenable to suit in South Carolina, finding that it did no more than solicit mail orders from South Carolina wholesalers and dealers and mail promotional material to doctors. The closer question was presented by the activities of Sterling Drug Company, which had filed an application to do business in South Carolina, appointed an agent for service of process, and maintained five "detail men" who lived in South Carolina and promoted Sterling's Products, but "whose primary responsibility is the promotion of drugs, not the actual sale of them." 444 F.2d at 746. The Court of Appeals refused to give any weight to the appointment of a statutory agent or the filing to do business [5], and, thus, it was faced with a case where the only contact with the forum was through the five, substantially non-selling, resident "detail men." Against this single category of contacts, the court arrayed the following facts: Sterling had no property in South Carolina with the exception of its drug samples used by the detail men, it maintained no bank accounts here, did not advertise in any directories, maintained no office in the state and warehoused no goods here. On the strength of these negative factors, the court found that the one contact classification—(detail men)—mentioned above was insufficient to confer jurisdiction over a foreign defendant on a foreign cause of action. Significantly, the record as reflected in the *Ratliff* case contained no figures of the amount of sales made in South Carolina, nor of the percentage of the time spent in South Carolina by the resident detail men in promoting drugs. Only one with the clairvoyance of a true Solomon would purport to be able to predict what effect these figures would have had on the outcome of the decision; for this court's purpose, those omissions must be considered in comparing the quality and nature of contacts there with those presented here.

*Lee v. Walworth Valve Company,* 482 F.2d 297 (4th Cir. 1973) is the second major guidepost along the journey to decision here. In *Lee,* a resident plaintiff sued Walworth, a foreign corporation, on a cause of action arising at sea. On the motion to dismiss by defendant, Walworth, plaintiff was magnanimously assisted in her opposition by a resident defendant, Lockheed Shipbuilding, which appeared interested in having company at the defense table during trial. Perhaps that fact explains why the *Lee* record contains more details concerning the foreign defendant's contacts with the forum than did *Ratliff.* The court found that Walworth and its subsidiaries maintained no place of business in South Carolina, owned no property here, had no bank accounts here, and had no resident salesmen or agent in South Carolina. Balanced against those facts were the visits of non-resident salesmen to South Carolina—(75–87 days annually)—sales in the state averaging from $180,000.00—$400,000.00 a year, and occasional visits to South Carolina by engineers to deal with plant problems. The court held that these contacts, combined with plaintiff's forum residence, and the unavailability of alternate forums—(save one)—rendered defendant amenable to suit

---

**5.** "We think the application to do business and the appointment of an agent for service to fulfill a state law requirement is of no special weight in the present context . . . The principles of due process require a firmer foundation than mere compliance with state domestication statutes." 444 F.2d at 748.

in South Carolina. In the course of its ruling, the court said "We might well hold that Walworth's activity in South Carolina was not enough to make it generally answerable to any plaintiff who wished to maintain a transitory cause of action in the courts of that state . . . ." 482 F.2d at 300. With this statement in mind, the court will compare the facts here with those of the two recited cases, keeping in mind that the question of amenability is not "merely . . . whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less . . . . Whether due process is satisfied must depend rather upon the quality and nature of the activity . . . ." (*Ratliff, supra,* at 747, *quoting International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

After close analysis, the record in *Ratliff* reveals that plaintiffs there had really mustered very little in the way of community involvement by Sterling Drug and almost nothing by Cooper Laboratories. With the stipulation in the record that the five Sterling "detail men" did very little selling, and with no figures in the record concerning the amount of sales made in South Carolina, the Court of Appeals had scant evidence upon which to find jurisdiction over the foreign defendant. Perhaps the record on appeal would reveal more, but the strength of the precedent must rely on the facts as recited in the opinion; those facts, as noted, are very weak indeed. *Lee v. Walworth,* a case with which this court is intimately familiar, presents a more developed record which reveals that the contacts there, while in some respects greater than those in *Ratliff,* were substantially less than those presented here, not only in amount but in "quality and nature." While the non-resident salesmen in *Walworth* spent a combined total of approximately eighty (80) days here annually, one of defendant, Proctor & Schwartz's, resident salesmen alone— (L.V. Neese)—spends at least two hundred (200) days in this state annually soliciting business and taking orders. The volume of business arising out of South Carolina in this case exceeds that conducted by *Walworth* by two to ten fold, depending on the figures chosen for comparison.[6] In addition, the existence of a distributorship agreement, the in-state negotiations on South Carolina contracts by the defendant's regional sales manager, the attendance and exhibition at the South Carolina Textile Show, the advertising in a local directory, and the ownership of some personal property—(file cabinets)—all contribute in varying degrees to the overall picture of a corporation which has substantially injected itself into the community and affairs of this state.[7] While no one, or even several, of these factors would be enough alone to fairly subject a foreign defendant to jurisdiction on a foreign cause of action, the court feels that the sum total of these contacts,[8] exceeding both the quantity and quality of those in *Lee*[9] and *Ratliff,* is sufficient to

**6.** These comparisons yield disparities in the sales figures for the two cases of from $400,000.00—$1,200,000.00 depending on the year chosen. Such figures, far from being "a little more or a little less", *Ratliff, supra,* at 747, evince a substantially greater interaction with the state than those in *Lee.*

**7.** As did the Court of Appeals in *Ratliff,* this court feels that compliance—(or non-compliance)—with state statutory corporate registration requirements is entitled to "no special weight in the present context." 444 F.2d at 748.

**8.** The recent Supreme Court opinion in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), which applies a contacts test to all assertions of jurisdiction under the due process clause, does not prevent assertion

of jurisdiction here when the fundamental fairness standard is met. Defendant, Proctor & Schwartz's, contacts with South Carolina cannot be compared in any meaningful way with the shares of stock in *Shaffer* which were attempted to be used as the magnet to draw the defendants into the forum on a foreign cause of action. The defendants in *Shaffer* had never set foot in the forum, whereas the defendant here has the substantial contacts described above. *See, Energy Reserves Group v. Superior Oil Co.,* 460 F.Supp. 483, 504 (D.Kan.1978).

**9.** In evaluating the present jurisdictional factors against those mentioned in *Lee,* the court is mindful that since *Lee* dealt with a resident plaintiff, any comments by the *Lee* panel on the possible outcome were plaintiff a non-resident are dicta, although certainly respected dicta,

satisfy due process scrutiny.[10] Therefore, the court finds that Proctor & Schwartz is subject to this court's jurisdiction on this basis.[11]

## PROCTOR & SCHWARTZ AS THE ALTER EGO OF SCM

Plaintiff's second avenue of attack to compel Proctor & Schwartz to defend this action on the merits postulates that SCM, the parent corporation of Proctor & Schwartz, and admittedly "doing business" here,[12] so dominates and controls Proctor & Schwartz as to make each the alter ego of the other for jurisdictional purposes.[13] Once again, the answer must turn on the facts as developed, keeping in mind the omnipresence of *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1924). That five-page opinion, obviously then correct on its facts, held that where a parent and subsidiary corpora-

and were not essential to the holding in the case.

**10.** Two other recent Fourth Circuit cases deserve mention. In *O'Neal v. Hicks Brokerage,* 537 F.2d 1266 (4th Cir. 1976), the court held that insufficient contacts existed over a Mississippi corporation—(Hicks)—to subject it to suit on a tort cause of action which arose from a North Carolina auto accident involving a South Carolina plaintiff and a third party's truck. The court found that Hicks had no offices in South Carolina, no directory listings in South Carolina, had solicited no business in South Carolina, and had no sales personnel in South Carolina. In fact, Hicks' only contacts with South Carolina were a few telephone calls and the arrangement of previous shipments of cotton by truck from Mississippi to South Carolina pursuant to Mississippi contracts. Hicks did not own or operate the trucks, but acted as a factor arranging for other trucking companies to transport the cotton. In addition, the commissions received by Hicks for arranging all the shipments mentioned did not exceed $10,-000.00. Finding the "sole thread" linking Hicks to South Carolina to be the arrangements of previous shipments, the court affirmed the order dismissing Hicks from the suit. Likewise, in *Grevas v. M/V Olympic Pegasus,* 557 F.2d 65 (4th Cir. 1977), the court found, in an action by a Greek seaman against the owners of his ship, which ship had stopped in Virginia for eight days, on a wage claim which arose "outside Virginia"—(at 68)—there were insufficient contacts with the state based on the "sole contact" of an eight-day visit to the Virginia port. Both of these cases are distinguishable, in this court's opinion, from the present case as each involved the most attenuated of contacts; in *O'Neal,* an indirect "meager remuneration" (537 F.2d at 1268) from arranging for a third party to travel to South Carolina; and in *Grevas,* a one time visit to the state.

**11.** The court notes that, were Proctor & Schwartz a third party-defendant, service might be properly made if it was "doing business" anywhere within 100 miles of the place of trial. *See, Sprow v. Hartford Insurance Company,* 594 F.2d 412 (5th Cir. 1979). How-

ever, in considering this new doctrine, the court is mindful of the words of Judge Learned Hand:

> "Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." *Spector Motor Service v. Walsh,* 139 F.2d 809, 823 (2nd Cir. 1944, Hand, J. dissenting).

To the extent that the conclusions reached in any portion of this opinion differ from any preliminary indications given by this court at oral argument, before full consideration of the cases mentioned above, this opinion, of course, controls.

**12.** *See, e. g.,* defendant Proctor & Schwartz's Answer to Interrogatory # 27.

**13.** The court emphasizes that this opinion is solely concerned with an examination of the corporate structures of the two defendants for jurisdictional purposes, not for the purpose of subjecting the parent to substantive liability for the acts of the subsidiary. While some courts have indicated that the two tests should be the same, there is respected authority holding that the tests are different. *See, Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 337, 45 S.Ct. 250, 69 L.Ed. 634 (1924); *Energy Reserves Group, Inc. v. Superior Oil Co.,* 460 F.Supp. 483, 506–7 (D.Kan.1978); *Rea v. An-Son Corp.,* 79 F.R.D. 25, 31 (W.D.Okla.1978). To the extent that "piercing the corporate veil" for substantive purposes requires a different showing than that needed to prove amenability to service, this court deals with the latter standard. The former question need never be reached here since Proctor & Schwartz is well able to respond in damages for any conceivable award; SCM's substantive liability is not in issue here. While many of the opinions are not completely lucid on the difference in standards to be applied to the jurisdictional, *vis a vis* the substantive issue, the major theme evident from the reported decisions is that substantive liability turns more on "control" while jurisdictional amenability turns on disregard of "corporate formalities." *See, Cannon Mfg. Co., supra,* 267 U.S. at 337, 45 S.Ct. 250, and the discussion in fn. 24, *infra.*

tion "in all respects" observe corporate formalities and distinctions, service upon the subsidiary cannot qualify as service upon the parent. Although the jurisdictional result in *Cannon* would probably be different today with the advent of long-arm statutes,[14] the opinion's comments on inter-corporate jurisdictional responsibility are still relevant today.

The relevant factors concerning the two corporations must be examined in some detail in order to analyze the corporate arrangement. SCM, a New York corporation, is a diversified manufacturer of consumer and industrial products, which has divided its operations among twenty operating groups, representing over one hundred product lines. In 1966, SCM merged with Proctor-Silex and became the owner of one hundred per cent of the stock of Proctor & Schwartz, its wholly owned subsidiary; Proctor & Schwartz is now included in one of the business groups of SCM. Proctor & Schwartz is a Pennsylvania corporation which maintains its headquarters in Philadelphia, Pennsylvania, separate from the headquarters of SCM which is located in New York City. It maintains its corporate records, bank accounts, seals, etc., separate from those of SCM although SCM owns one hundred per cent of its stock. The two corporations maintain separate Boards of Directors although at oral argument, it was admitted that, as a rule, the Board of Directors of Proctor & Schwartz does not meet, although it may have met once recently in a *pro forma* proceeding.[15] The day-to-day operations of Proctor & Schwartz are primarily supervised by its Vice-President of Administration. After some initial confusion in the record over whether or not Proctor & Schwartz had a president,[16] it appears that a James R. Johnson is the President, although he has been described by Proctor & Schwartz management personnel as a "group vice president."[17] Regardless of his title, it appears that Johnson reports not to the Proctor & Schwartz Board of Directors, but to a vice-president of SCM Corporation, William Rodick.[18] This unusual chain of command

14. Cannon could today presumably serve Cudahy Packing, the foreign corporation, directly without relying on the "presence" of the subsidiary. Although the record is not entirely clear, it appears from a reading of the lower court opinion that the North Carolina plaintiff corporation (Cannon) was suing on a contract to be performed at least in part in North Carolina. Under these facts, jurisdiction would lie today under a long-arm statute similar to S.C. Code § 36–2–803(1)(a), (b), (g), (h). North Carolina has similarly construed her statutes. *See, e. g., Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629 (1977); *Goldman v. Parkland of Dallas, Inc.*, 277 N.C. 223, 176 S.E.2d 784 (1970); and the Supreme Court has expressed constitutional approval of these extensions of jurisdiction. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

15. This revelation is a direct contradiction to the tenor of the affidavit of the Vice-President of Proctor & Schwartz who stated:
"Said Board [of Proctor & Schwartz] holds its own separate Board meetings independently of the Board meetings of SCM Corporation's Board of Directors."
It also appears that the last meeting of the Board of Directors of Proctor & Schwartz was held at SCM headquarters in New York, which was obviously convenient since all members of the Board of Directors of Proctor & Schwartz are officers of SCM.

16. The following inquiries were made of C. W. Schwartz, a member of the founding Schwartz family of Proctor & Schwartz, and currently a district sales manager. These inquiries reveal candidly the understanding of a member of the company's management about the actual corporate operation:
"Q. Do you know who the Board of Directors of Proctor & Schwartz are [sic]?
A. There are [sic] no board of directors of Proctor & Schwartz.
Q. Do you know who the president of Proctor & Schwartz is?
A. There is no president of Proctor & Schwartz.
Q. Does Proctor & Schwartz have a president?
A. No.
Q. How about a secretary?
A. No." (Schwartz deposition at 29).

17. C. W. Schwartz deposition, at 4.

18. The candid deposition of Mr. Johnson, taken in connection with another case against Proctor & Schwartz—(*Priester v. Proctor & Schwartz*, C/A No. 78–489, D.S.C.1978)—and made a part of this record by consent, further indicates the managerial entanglement between Proctor & Schwartz and SCM:

completely bypasses the dormant Proctor & Schwartz Board of Directors and results in Proctor & Schwartz corporate policy being set by an officer of SCM. Further infiltration of Proctor & Schwartz's supposedly "independent" operation is found in the fact that ten of the fourteen officers of Proctor & Schwartz are officers and/or employees of SCM. In answering interrogatories, the defendant Proctor & Schwartz stated that the extent of SCM's control over Proctor & Schwartz was "offer[ing] advice and assistance when and where necessary";[19] however, oral argument revealed that the chain of command discussed above, which logically culminates in all overall policy decisions being made for Proctor & Schwartz by the officers and ultimately the directors of SCM.[20]

The court has also taken note of other factors affecting the corporate relationship

Q. Do you know when was the last time the Board of Directors of Proctor & Schwartz met?
A. You mean the one that I was a part of.
Q. No, since 1966.
A. No.
Q. Do you know if there have been any meetings of the Board of Directors of Proctor & Schwartz?
A. I don't know.
Q. Have you received any instructions from the Board of Directors of Proctor & Schwartz?
A. No.
Q. Who do you receive instructions from, as far as the running of Proctor & Schwartz?
A. Well, Proctor & Schwartz runs quite autonomously, actually. It is a day-by-day operation. My responsibility, I report to Bill Rodick.
Q. Where is Bill Rodick located?
A. Bill Rodick is President of the Chemical/Metallurgical Division. He's located in Towson.
Q. He is an officer of SCM?
A. Vice President.
Q. You report to him now, as you would have to the Board of Directors prior to 1966?
A. I reported to Kay Schwartz, my President.
Q. You reported to the President, Mr. Schwartz, who would have reported to the Board of Directors; is that correct?
A. He reported to the Board of Directors.
Q. Prior to 1966?
A. Yes, actually, that is true.
Q. But, now, rather than report to the Board of Directors of Proctor & Schwartz, you report to Mr. Rodick: is that correct?

of SCM and Proctor & Schwartz. For instance, SCM arranges legal insurance and administrative services for Proctor & Schwartz; there is no indication in the record that Proctor & Schwartz could refuse any or all of these services although it pays its proportionate share of the expenses for them. It is unlikely, with the management entanglement described above, that Proctor & Schwartz would, or could, refuse such an arrangement. Proctor & Schwartz is covered by SCM's product liability policy—(although Proctor & Schwartz is *presumably* billed for its pro rata share of the premiums); Proctor & Schwartz' income is reported on the SCM federal tax return and it is included in the SCM annual report; SCM has at least on one occasion represented itself as the manufacturer of equipment actually manufactured by Proctor & Schwartz.[21]

A. I report to Mr. Rodick. I never reported to the Board of Directors, as I said.
Q. Do you know who Mr. Rodick's supervisor is?
A. Yes, Paul Neihardt (sic).
Q. And, he is also an officer of SCM?
A. Yes.
Q. What is the next step in the chain of command of SCM?
A. Above Paul Neihardt?
Q. Yes.
A. Paul Ellicker (sic).
Q. And, he is President of SCM?
A. Yes.

**19.** Answer to plaintiff's second set of Interrogatories, # 9.

**20.** James R. Johnson, the President of Proctor & Schwartz, reports to William Rodick, corporate vice-president of SCM, who reports to Paul W. Neidhardt, senior division vice-president of SCM, and Paul H. Elicker, President of SCM; the latter reports to the Board of Directors of SCM.

**21.** In a prospectus dated May 19, 1976, SCM stated:

"The company [SCM] also manufactures industrial drying equipment under the 'Proctor & Schwartz' name. Most of this equipment is custom engineered for particular customer application."

This language is certainly puzzling in the face of SCM's present posture that "it [Proctor & Schwartz] is *not* a manufacturer, distributor, or retailer of its parents [sic] products."

On the other hand, Proctor & Schwartz negotiates its own union labor contracts; it employs and terminates its own subordinate employees;[22] it secures its own credit, leases, and facilities; it prepares its own sales brochures; it pays it own state unemployment insurance funds to each state where required; and it prepares its own invoices, bills, and price lists.

Based on a realistic assessment of the facts hereinbefore recited, the court must determine whether corporate separateness has been maintained. As noted previously, *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1924), is the cornerstone for all discussions on this point. In *Cannon*, corporate distinction was "in all respects observed" (267 U.S. at 335, 45 S.Ct. 250); likewise, in *Harris v. Deere and Company*, 223 F.2d 161 (4th Cir. 1955), "despite the control exercised by the parent, the separate corporate entity of the subsidiary is observed" (223 F.2d at 162); and in *Manville Boiler Co. v. Columbia Boiler Co.*, 269 F.2d 600 (4th Cir. 1959), the court found:

"The Virginia corporation was treated as a separate entity, though its policies and activities were directed from Pottsdown [location of parent]."

The *Manville* court went on to say:

"If the rule of [*Cannon Mfg. Co. v. Cudahy Packing Co.*] unduly emphasizes the form in which related corporations cast their intercorporate transactions and minimizes the control exercised by the one of the other, the rule, nevertheless, is well established." 269 F.2d at 606.

Thus, as repeatedly recognized by the Fourth Circuit Court of Appeals, the rule of *Cannon Mfg. Co.* exalts form over substance. As long as the two corporations maintain formal corporate separateness "in all respects", the *de facto* control of one by the other does not justify piercing the corporate veil.[23] However, one who lives by the sword must die by the sword; if observation of all corporate formalities prevents subjecting the parent to jurisdiction *via* the activities of the subsidiary—(or *vice versa*)—then disregard of corporate formalities will void that protection.

In the present case, the most fundamental of all corporate formalities has been disregarded; Proctor & Schwartz has no functioning Board of Directors; rather Proctor & Schwartz's corporate policy is set by an officer of SCM who is answerable to

---

**22.** Since the top management of Proctor & Schwartz reports to SCM executives, it is unlikely that higher echelon employees would be fired without consultation with those in authority at SCM.

**23.** The court notes that some courts have read recent Supreme Court opinions, notably *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), as draining *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) of all or a part of its remaining vitality. *See, e. g., Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483, 490 (D.Kan.1978):

"Reliance on the rule of *Cannon* is unsound when extraterritorial service is authorized by statute and when personal jurisdiction is predicated on the due process standards of *International Shoe*."

This court must leave to its own Court of Appeals a determination of whether:

"[T]he doctrine of the line of cases to which we have referred [*Cannon*] is overruled or modified." *Harris v. Deere and Company*, 223 F.2d 161, 163 (4th Cir. 1958).

However, this court feels that those cases which narrowly read *Cannon* appear well reasoned and worthy of close consideration.

In addition, the court notes that in *Szantay v. Beech Aircraft Corp.*, 349 F.2d 60 (4th Cir. 1965), the court approved the finding of the lower court, (237 F.Supp. 393 (E.D.S.C.1964)) that Beech was subject to service of proces in South Carolina through the activities of its local distributor, Hawthorne Aero Sales (349 F.2d at 62). Even though the two corporations were separate and distinct entities, the court found that the control exercised by Beech over Hawthorne, which was admittedly doing business in South Carolina, was sufficient to subject Hawthorne to personal jurisdiction on a "doing business theory." This court views *Szantay* as a substantial weakening of the authority of the *Harris* and *Manville Boiler* case discussed in the body of the Order.

the SCM Board of Directors. With this fact established, Proctor & Schwartz becomes not an independent operating entity, but a *de facto* division of SCM. One might well ask whether the control exercised here is any different than if SCM—(as sole stockholder)—had elected an operating board for Proctor & Schwartz and dictated what actions it should take. However, as recognized by the Court of Appeals for the Fourth Circuit, control is not determinative under *Cannon*; maintenance of formalities is. Here, the most important formality has been completely disregarded—the *sine qua non* of a corporation is its Board of Directors—and a corporate vice-president of SCM has usurped that position in Proctor & Schwartz for purposes known only to SCM. In addition, the financial interactions between the two corporations reveal the tenuous nature of the defendants' "independence" argument here. This court knows of no instance where one corporation performs accounting and payroll services for another "independent" corporation without a profitable charge, as is the case here, if defendants' arguments are accepted. Based on an analysis of the factors extant in the record, the court has determined that Proctor & Schwartz has not maintained a separate corporate existence for the purpose of this suit and, on the facts as found here, it is subject to service of process through the admitted presence of its parent, SCM. In reaching this determination, the court has considered *all* the facts found above relative to inter-corporate relationships, and from a combination of the financial and managerial entanglements mentioned, and the equities of the entire situation,[24] it has reached the aforesaid conclusion.[25]

24. *Concrete Ready Mix of Lynchburg, Inc., et al. v. Lawyers Title Insurance Corporation* (4th Cir. 1979) 604 F.2d 289 at page 292.

25. Defendants have submitted a supplemental memorandum citing several cases, dealing with the *substantive* liability of a shareholder, officer, or corporate parent, in support of their position on the *jurisdictional* issue. As previously pointed out—(See Footnote 13)—there is respected authority that the tests for jurisdictional amenability and substantive liability are different, with the former turning more on maintenance of formalities and the latter turning more on actual control. In *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir. 1976), a case imposing substantive liability on a corporate president for the acts of the corporate shell, Judge Russell, writing for the panel, recognized that, in a case dealing with *substantive* liability: "the courts are concerned with reality and not form." By comparison, Chief Judge Haynsworth, in *Manville Boiler Co. v. Columbia Boiler Co.*, 269 F.2d 600, 606 (4th Cir. 1959), a case concerning *jurisdictional* amenability, wrote about the basis of the *Cannon* analysis as follows:

"If the rule of that case [*Cannon*] unduly emphasizes the form in which related corporations cast their intercorporate transactions and minimizes the control exercised by the one of the other, the rule, nevertheless, is well established."

Like *DeWitt, supra*, the other cases cited by defendants in their supplemental memorandum all concern imposition of substantive liability on one hiding behind the corporate veil. *See, Berger v. Columbia Broadcasting System*, 453 F.2d 991 (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972) [breach of contract action to hold parent on contract entered into by subsidiary]; *American Trading and Production Corp. v. Fischbach and Moore, Inc.*, 311 F.Supp. 412 (N.D.Ill.1970) [action to hold parent for fire caused by wiring installed by subsidiary]; *Brown v. Moorhead Oil Co.*, 239 S.C. 604, 124 S.E.2d 47 (1962) [action to hold oil company for injury to worker employed by related tire recapping company].

Overlooking the question that the cited cases all concern substantive liability, the court has examined the facts of each of these cases and found them to either differ substantially from those facts in the case at bar or such facts support the result reached here. In *DeWitt Truck Brokers, supra*, the court allowed the corporate veil to be pierced, relying in part on the fact that "there were no corporate records of a real directors' meeting in all the years of the corporation's existence", 540 F.2d at 687, a factor also present here since the SCM takeover. It is also interesting to note that *DeWitt* specifically rejects defendants' contention, repeated numerous times in their briefs, that, in order to pierce the corporate veil, fraud must be found. (*DeWitt, supra*, at 684). In *Berger v. Columbia Broadcasting System, Inc., supra*, the court found "the total absence of any evidence showing the defendant's [parent's] actual domination of its subsidiary"—453 F.2d at 997. Finally, in *Brown v. Moorhead Oil Co., supra*, the court notes that "the legal entity—[of the affiliate]—was preserved. Neither of the corporations owned stock in the other . . . ." 124 S.E.2d at 50. These cases, quite different from the case at bar, illustrate that the facts of each case are critical to its resolution; none of the cases cited support defendants' position here.

### IS VENUE PROPER?

■ Only short mention need be made of this contention as the court is convinced that defendants' cases on this point are irrelevant to the facts here. The cases cited by defendants contend the unobjectionable proposition that a finding of personal jurisdiction through minimum contacts does not automatically satisfy the "doing business" requirement for corporate venue purposes. *See, e. g., P. C. Products Corp. v. Williams,* 418 F.Supp. 331 (M.D.Pa.1976). The previous holding of this court that defendant Proctor & Schwartz is "doing business" for the purposes of constitutionally subjecting it to jurisdiction under S.C. Code § 36–2–802—(the "doing business" section—see fn. 1, *supra* )—necessarily requires more contacts than the "minimum contacts" test of S.C. Code § 36–2–803—(the "long arm statute"). Therefore, this court does not have to determine whether 28 U.S.C. § 1391(c) "doing business" venue is satisfied upon a finding that a corporation is "transacting any business", although there is authority to that effect. *See,* Ga.L.Rev. 296, 311 (1978). Since this case does not turn on the South Carolina long-arm statute, but rather on a finding that Proctor & Schwartz is "doing business" here, the court has no trouble finding that venue is proper. Should venue prove inconvenient here for the defendants, they may make the motion they proposed—for a change of venue under 28 U.S.C. § 1404(a).

### THE "DOOR–CLOSING" STATUTE

Defendants next contend that even if jurisdiction and venue are proper by virtue of the preceding discussion, the South Carolina "Door-Closing" Statute, § 15–5–150, prevents maintenance of this action in this court. That Section provides:

"An action against a corporation created by or under the laws of any other state, government or country may be brought in the circuit court:

(1) by any resident of this state for any cause of action; or

(2) by a plaintiff not a resident of this state when the cause of action shall have arisen or the subject of the action shall be situated within this state."

It is clear, and the South Carolina Supreme Court has so held, that this statute prevents a nonresident of South Carolina from suing a foreign corporation on a foreign cause of action in the circuit courts of the state, even though the foreign corporation is constitutionally within reach of state service of process. *See Nix v. Mercury Motor Express, Inc.,* 270 S.C. 477, 242 S.E.2d 683 (1978); *Gibbs v. Young,* 242 S.C. 217, 130 S.E.2d 484 (1963); *Hodges v. Lake Summit Co.,* 155 S.C. 436, 152 S.E. 658 (1930). Thus, the door to the state circuit court is firmly closed to the instant plaintiff by § 15–5–150; the question here is whether the door to the federal court is similarly shuttered.

■ In this Circuit, any discussion of the application of § 15–5–150 must begin with *Szantay v. Beech Aircraft Corp.,* 349 F.2d 60 (4th Cir. 1965). In *Szantay,* Illinois citizens sued a nonresident corporation—(Beech)—and a resident corporation—(Dixie)—on a Tennessee wrongful death claim arising from the crash of an airplane manufactured by Beech and serviced by Dixie in South Carolina. Beech contested the fact that it had sufficient contacts with South Carolina to be subject to service of process, and, also, moved to dismiss the action against it on the basis of the state "door-closing" statute. After finding sufficient "contacts" and deciding that the "door-closing" statute was neither a substantive right, nor a procedure intimately bound up with a state right or obligation, the court in *Szantay* faced the question whether it should follow the state statute which adopted a procedure, which, while not intimately enmeshed with a state right, would, nevertheless, substantially affect the outcome of the litigation. Finding the answer to lie not in the Constitution, but in "comity", the *Szantay* court determined that such a statute should be applied by the federal court unless there were affirmative counterveiling federal considerations. The court indicated by its search for a rational reason for the statute's existence that the adherence

to be given such an enactment may vary with the strength of the state public policy underlying it:

"It is necessary to go on and inquire whether the South Carolina rule embodies important policies that would be frustrated by the application of a different federal jurisdictional rule and, if so, is this policy to be overridden because of a stronger federal policy." 349 F.2d at 64.

The court then explored possible policy bases for the statute,[26] finding two proposed reasons "not binding on the federal court",[27] the third "attenuated"[28] and concluding:

"The most that can be said for Beech's argument is that it demonstrates that the state's reason for enacting its 'door-closing' statute is uncertain." 349 F.2d at 65.

Marshaled against this weak and uncertain state policy behind the statute, the court found:

"The countervailing federal considerations, however, are explicit, and they are numerous. The most fundamental is that expressed in the constitutional extension of subject-matter jurisdiction to the federal courts in suits between citizens of different states." 349 F.2d at 65.

The court stated additional countervailing federal considerations, among them being the Full Faith and Credit Clause, the federal policy to encourage efficient joinder in multi-party actions, and the duty of federal courts to hear and adjudicate the issues before it.[29] Based on these factors, the court refused to apply the door-closing statute to the federal action.

The *Szantay* case has sparked much debate among the members of the bench and bar of South Carolina, as well as comment from the law reviews. *See, e. g.,* 91 *Harv. L.Rev.* 356 (1977). It has been argued by some that:

"The important point to note from *Szantay* is the court's indiscriminate use of analyses derived from [*Byrd v. Blue Ridge Corporation,* 356 U.S. 525, 78 S.Ct. 893 [2 L.Ed.2d 953] (1958)] and [*Hanna v. Plumer,* 380 U.S. 400 [460], 85 S.Ct. 1136 [14 L.Ed.2d 8] (1965)], without any overt

---

**26.** These were: statutory forum non conveniens; docket congestions; encouragement to foreign corporations to transact business in South Carolina.

**27.** Obviously, a state doctrine of forum non conveniens does not bind the federal court, *Parsons v. Chesapeake & Ohio RR Co.,* 375 U.S. 71, 84 S.Ct. 185, 11 L.Ed.2d 137 (1963)— [federal court not deprived of power to entertain motion to transfer venue in federal case even though state court dismissed same action on grounds of *forum non conveniens*]. Likewise, considerations of state docket congestion —(which the *Szantay* court thought could not have been a legitimate reason in 1870 when the statute was passed)—do not have any relevance to the condition of federal dockets. *Cf., Douglas v. New York, New Haven & Hartford RR Co.,* 279 U.S. 377, 49 S.Ct. 355, 73 L.Ed. 747 (1929). A thundering reaffirmation of the *Szantay* court's opinion that state and federal docket considerations are independent may well be forthcoming—(despite the protests of a large segment of the judiciary and the overwhelming number of state bar associations)—in one of the proposed bills to abolish diversity jurisdiction introduced periodically in Congress. These bills would lessen the case load in federal court at the expense of state court congestion. While this is one of the strongest arguments for

preserving diversity—(there are many others) —(See, 91 *Harv.L.Rev.* 317 (1977))—for the purposes of this case, these bills reflect the different considerations relevant to state-federal docket control.

**28.** The *Szantay* court found that if the purpose of the "door-closing" statute was to encourage foreign corporations to do business in South Carolina, several contemporaneous enactments by the same session of the Legislature, such as appointing any South Carolina agent of a foreign corporation as the corporation's agent for service of process on any cause of action, lessened that encouragement considerably.

**29.** While the *Szantay* panel indicated that a nonresident could gain access to South Carolina courts on a foreign wrongful death cause of action by qualifying as an administrator under South Carolina law, this comment, apparently incorrect under present South Carolina law, *Nix v. Mercury Motor Express, Inc.,* 270 S.C. 477, 242 S.E.2d 683 (1978), and arguably inaccurate at the time of *Szantay,* (*Hodges v. Lake Summit Co.,* 155 S.C. 436, 152 S.E. 658 (1930)), appears in the penultimate paragraph of the *Szantay* opinion, more of an afterthought than as a basis for decision.

concern for the fact that its discussion was invoking two different versions of *Byrd* and a potentially inconsistent one from *Hanna.*" 91 *Harv.L.Rev.* 356, 370 (1977).

However, the same commentary, speaking directly to the issue here, said:

"Yet, if a state did devise procedural rules that varied depending on whether the litigant was in-state or not, there would be a powerful justification, based on the purposes of the diversity jurisdiction . . . for declining to follow the state rule." 91 *Harv.L.Rev.* 356, 392 n. 190 (1977).

Since the decision in *Szantay*, there has been no undermining of its reasoning or decision by the Fourth Circuit Court of Appeals. The decision was cited with approval in *Atkins v. Schmutz Mfg. Co.*, 435 F.2d 527, 535 (4th Cir. 1970); and a reexamination of the doctrine was found unnecessary in *Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745, 749 (4th Cir. 1971) since that case was dismissed on jurisdictional grounds. Most recently, in *Bumgarder v. Keene Corp.*, 593 F.2d 572, (4th Cir. 1979), a decision awaited with anticipation by this court for its possible comments on the *Szantay* issue, which was extensively briefed, the court found it unnecessary to analyze the *Szantay* arguments. Finding that Bumgarder "could have maintained his suit in North Carolina", the court said "Because there was an alternate forum to the South Carolina court where Bumgarder could gain full relief, we find *Szantay* does not apply." 593 F.2d at 573.[30]

Although an argument could be made that *Bumgarder* implies that a foreign plaintiff should not avoid the "door-closing" statute if he had an alternate forum available *at any time*, the facts of that decision do not support such an extension of the holding. Since, in *Bumgarder*, the plaintiff had an alternate forum available at the time he filed suit in South Carolina, there was no reason for the court to consider a *Szantay* balancing test, as plaintiff's need for a South Carolina forum was diminished. Here, by contrast, there is no indication in the record that the plaintiff had, at the time suit was filed in South Carolina, any alternate forum available; therefore, the *Szantay* considerations apply. This court is extremely hesitant to imply that a one-page, two-paragraph *per curiam* opinion—(*Bumgarder*)—would so drastically alter the import of a fourteen year old fully considered opinion—(*Szantay*). The plaintiff here, like Szantay at the time she filed suit, had no alternate forum available. The fact that plaintiff here had, at one time, an alternate forum, but that he was barred by law from proceeding in the alternate forum before the filing in South Carolina, does not bar the application of the *Szantay* test.

■ Turning to the application of *Szantay* to the case at bar, it is first necessary to consider an additional policy argument advanced by defendants' counsel in support of the door-closing statute. At oral argument, counsel for the defendants posited that the door-closing statute was South Carolina's answer to the "borrowing" statutes enacted by other states. These "borrowing" statutes operate to compel forum courts to adopt the *lex loci*, including its statute of limitations, at least where the *lex loci* contains a shorter statute of limitations. Counsel argues that South Carolina has accomplished the same result by a different means. The argument, however, is not persuasive. Initially, the court notes that

---

**30.** The record in *Bumgarder* revealed that the statute of limitations had not run in plaintiff's residence—(North Carolina)—when he sued in South Carolina, so the Court of Appeals found that countervailing federal considerations in favor of providing plaintiff a forum did not prevail when he had a suitable forum elsewhere. Here, by contrast, the statute of limitations had run in Georgia long before the suit in South Carolina federal court was instituted, rendering

*Bumgarder* of little assistance to this court. The *Bumgarder* opinion, in fact, raises several questions, among them the lack of a suggestion for a transfer to North Carolina, such as was used in *O'Neal v. Hicks Brokerage Co.*, 537 F.2d 1266 (4th Cir. 1976), especially since the North Carolina statute of limitations had probably run by the time of the Fourth Circuit decision in *Bumgarder*.

while a borrowing statute bars only foreign claims filed by nonresidents *after* the statute in the locus has run, the door-closing statute operates much more harshly to bar all foreign plaintiff-foreign causes of action no matter when brought. The results achieved by the statutes are, therefore, not co-extensive. Additionally, just as with the policy reasons found by the *Szantay* panel to be inapplicable to the federal courts or attenuated, there is no suggestion in the record that the South Carolina Legislature had any inkling of enacting a type of "borrowing" statute when it passed what is now § 15–5–150. Indeed, the six-year South Carolina Statute of Limitations, § 15–3–530(5), in effect at the time of enactment of the "door-closing" statute—(S.C. Code § 114 (1870))—coupled with the longstanding South Carolina policy of applying the South Carolina Statute of Limitations to a foreign cause of action,[31] belies a claim that the Legislature ever envisioned the "door-closing" statute as a "borrowing" statute. If the Legislature had intended to enact a "borrowing" statute, it certainly would be hard pressed to choose a more obscure manner to do so. As did the court in *Szantay*, this court feels that the best that can be said for the defendants' search for a policy behind the statute is that the proffered arguments indicate that the reasons for the statute are "uncertain."

The countervailing federal considerations present here are, by contrast, weighty and entitled to considerable deference. "The most fundamental is that expressed in the constitutional extension of subject matter jurisdiction to the federal courts in suits between citizens of different states." (349 F.2d at 65). As long as diversity jurisdiction, in existence since 1789, continues as a viable basis of federal court jurisdiction, this consideration commands substantial weight. While some commentators have assumed that local prejudice against "for-

eigners" no longer exists today, recent studies indicate that a federal forum is selected in a large percentage of cases due to perceptions of lingering local prejudice.[32] For a nation "that prides itself not only on doing justice but on being seen to do justice,"[33] it may well be that the barrier to perceptions of local prejudice provided by the federal court is equally as important as actually guarding against genuine local prejudice. In any event, this most fundamental countervailing conservation is just as applicable here as it was in *Szantay*.

It can hardly be said that plaintiff's choice of South Carolina as a forum was frivolous; desperate perhaps, but not frivolous. While Szantay could only sue all her defendants in South Carolina—(due to joinder problems)—plaintiff here could, at the time of filing, only sue, *if at all*, in South Carolina.[34] This brings into focus another of the federal considerations found important in *Szantay*, that is, the duty of a federal court to hear and adjudicate the issue before it by providing the parties with a forum for litigation. It is solely by an accident of residence that South Carolina bars this action in her courts; had plaintiff *bona fide* moved to South Carolina and commenced his suit, the state courts would welcome the action. In this regard, the cogent words of Chief Judge Haynsworth, quoted in *Szantay*, (349 F.2d at 65) are instructive:

> "[A] nonresident litigant in resorting to the federal diversity jurisdiction should obtain the same relief a resident litigant asserting the same cause of action would receive in the state courts." *Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir. 1961).

The sentiment expressed by Judge Haynsworth echoes that rooted in the laws of civilized countries since Biblical days:

> "Ye shall have one manner of law, as well for the stranger, as for one of your country." *Leviticus* 24:22.

---

**31.** *See Gattis v. Chavez*, 413 F.Supp. 33, 35 (D.S.C.1976); *Levy v. Boas*, 2 Bailey 217 (1831).

**32.** See 91 *Harv.L.Rev.* 317, 330–31 (1977).

**33.** 91 *Harv.L.Rev.* 317, 330 (1977).

**34.** The record is silent as to whether any other state with a six-year statute of limitations had any contacts with either defendant.

**1152**

This court feels, while the facts here differ to a degree from those in *Szantay*, that the coincidence far exceeds the disparities. Until modified by higher authority, *Szantay*, a case cited with approval many times since its publication,[35] controls on this question. The door to the federal court is not closed by § 15–5–150.

### DOES THE GEORGIA TWO–YEAR STATUTE OF LIMITATIONS BAR THIS SUIT?

■ Defendants, recognizing the age old tradition of the South Carolina courts, and many others, which applies the statute of limitations of the forum, and acknowledging that this rule is binding on the federal court, rather half-heartedly ask the court to blaze new ground and refuse to apply such precept in this case. The basis for the request is a perceived violation of the "spirit of Erie",[36] i. e., "should a litigant be able to proceed in federal court by use of the South Carolina six-year statute of limitation when the state court would bar the action because of the 'door-closing' statute?" It is readily apparent that the defendants "doth protest too much." This court is bound to adopt the substantive law of South Carolina including the state's choice of law rules;[37] South Carolina utilizes its statute of limitations regardless of where the cause of action arises. This court is bound to adopt the state statute of limitations in this diversity case. *Atkins v. Schmutz Mfg. Co.*, 435 F.2d 527, 529 (4th Cir. 1970).

With these legal principles stated, it becomes apparent that the defendants are once again arguing that the *Szantay* interpretation of the "door-closing" statute tilts the *Erie* state-federal balance to their detriment. This argument, as explained previously, misses the mark. When the federal court adopts the state statute of limitations, but not the state door-closing statute, it

acts out of different considerations. The former is a generally applicable, nondiscriminatory enactment as to which there are no countervailing considerations; the latter is a discriminatory, selective statute to which there are numerous countervailing considerations. The most fundamental of these are, of course, rooted in the purposes of diversity, as previously discussed.

The distinction between discriminatory and non-discriminatory state statutes is highlighted by a series of Supreme Court cases. In *Hughes v. Fetter*, 341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951), and *First National Bank v. United Air Lines*, 342 U.S. 396, 72 S.Ct. 421, 96 L.Ed. 441 (1952), the Court struck down forum statutes which barred entertainment of foreign wrongful death actions while allowing maintenance of such domestic actions. *Hughes v. Fetter* arose from the Wisconsin state court, *First National Bank v. United Air Lines* came from the federal district court in Illinois; the Supreme Court found no distinction for the purposes of the Full Faith and Credit Clause and struck both statutes on constitutional grounds. In contrast, in *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 73 S.Ct. 856, 97 L.Ed. 1211 (1953), the court sustained Pennsylvania's application of its one-year statute of limitations to an Alabama wrongful death action even though Alabama applied a two-year statute of limitations to wrongful death actions. In distinguishing the cases, the Court said:

"Our decisions in *Hughes v. Fetter*, 341 U.S. 609 [71 S.Ct. 980, 95 L.Ed. 1212] (1951) and *First National Bank v. United Air Lines*, 342 U.S. 396 [72 S.Ct. 421, 96 L.Ed. 441] (1952), do not call for a change in the well-established rule that the forum state is permitted to apply its own period of limitation. The crucial factor in those two cases was that the forum laid an uneven hand on causes of action aris-

---

**35.** *See, e. g., Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1325 (2nd Cir. 1977); *Atkins v. Schmutz Mfg. Co.*, 435 F.2d 527 (4th Cir. 1970); *Karara v. County of Tazewell*, 450 F.Supp. 169, 171 (W.D.Va. 1978); *Sasso v. Koehler*, 445 F.Supp. 762, 766 (D.Md.1978).

**36.** *Erie RR Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**37.** *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

ing within and without the forum state. Causes of action arising in sister states were discriminated against. Here Pennsylvania applies her one-year limitation to all wrongful death actions wherever they may arise." 345 U.S. at 518–19, 73 S.Ct. at 858.

In addition to the constitutional implications of the type of state statute as is involved here, there is the added factor of the independent grant of subject matter jurisdiction to the federal courts as pointed out by Mr. Justice Jackson, concurring in *First National Bank v. United Air Lines* which, as noted, arose from the federal district court. In pointing out that the Court there did not have to reach the constitutional issue when the case had been filed in the federal, rather than the state, court, Mr. Justice Jackson wrote:

> "There are two possible routes to the agreed destination. One requires that a state statute prescribing jurisdictional limitations on its own courts be declared unconstitutional—a path which a century and a half of precedent constrains us to avoid if another way is available. This, together with adherence to the views expressed in dissent in *Hughes v. Fetter*, 341 U.S. 609 [71 S.Ct. 980, 95 L.Ed. 1212], persuades me to resolve the issue of jurisdiction of federal courts by reference to the Act of Congress which confers that jurisdiction.
>
> Whether or not Illinois may validly close her own courts to litigation of this kind, Illinois most assuredly cannot prescribe the subject matter jurisdiction of federal courts even when they sit in that State. Congress already has done this, 28 U.S.C. § 1332(a)(1), and state law is powerless to enlarge, vary, or limit this requirement. The parties to this case have showed the diversity of citizenship and amount in controversy required by Congress, and therefore the federal court, by virtue of the law of its own being, has jurisdiction of their action.
>
> The suggestion that *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188], and its progeny diminish the jurisdiction of a federal court sitting in a diversity case by assimilating any limitation that the state may impose on her own courts seems to confuse the law of jurisdiction with substantive law. In *Erie* and the cases which have followed, this Court has gone far in requiring that a federal court exercising diversity jurisdiction apply the same law as would be applied if the action were brought in the state courts. But in so doing the Court has been interpreting the Rules of Decision Act, 28 U.S.C. § 1652, which reads as follows:
>
> > 'The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.'
>
> It is indeed fanciful to suggest that a state statute relating to the power of its own courts is an applicable 'rule of decision' under this statute, when Congress in passing the federal jurisdictional grant has specifically 'otherwise required and provided.' 28 U.S.C. § 1332(a)(1). The petitioner enters the federal court not by the grace of the laws of Illinois but by the grace of the laws of the United States." 342 U.S. at 399–400, 72 S.Ct. at 423.

These same sentiments were expressed by the *Szantay* panel (349 F.2d at 64) and are applicable here.

The defendants' argument is a simple request that this court adopt by judicial fiat a construction of the "door-closing" statute which would make it a hybrid "borrowing-barring" statute to prevent all foreign plaintiff-foreign causes of action against nonresidents in this court. For the reasons previously express, the court declines the invitation to write when the Congress has been silent.

## THE POSSIBILITY OF A TRANSFER TO GEORGIA

Arriving at this point in the opinion, the court is given pause by the words of Oliver

Cromwell's plea just before the Battle of Dunbar:

"I beseech ye in the bowels of Christ, think that ye may be mistaken."

Contemplating that perhaps, those who pass judgment on this effort may view this court's decision on the matters previously discussed through other glasses, the court has determined to complete the judicial mosaic by expressing its opinion on the alternate basis for disposition of this matter, namely, transfer to the Northern District of Georgia, Rome Division, under 28 U.S.C. § 1406(a).[38] In this regard, the words of Judge Learned Hand, with appropriate additions, aptly describe the court's situation:

"It seems to me that if we are to be saved [from preparation of an additional opinion] it must be through skepticism." [39]

Therefore, possessing enough skepticism to warrant preparation of this final alternative section of the opinion, the court will consider the authorities applicable.

■■■ It is undisputed that in a transfer under 28 U.S.C. § 1404(a)—(venue proper, transfer for convenience of witnesses)—an action may be transferred to any district where it "might have been brought" considering federal standards alone, and without regard to state laws, such as statutes of limitation, capacity of personal representatives, etc., *Van Dusen v. Barrack*, 376 U.S. 612, 629, 84 S.Ct. 805, 11 L.Ed.2d 945 (1963). Additionally, such a transfer is merely a change of courtrooms without a change in applicable law, *Van Dusen, supra*, at 632, 84 S.Ct. 805. Thus, if this case were one of inconvenient venue, the court would be able to transfer it to Georgia, and such transfer would carry with it South Carolina law.[40] The question presented here is whether the court should transfer this case to Georgia

contingently, in the event that its jurisdictional rulings are reversed.

The Court of Appeals for the Fourth Circuit has indicated that, in a case where jurisdiction is improper, the court should transfer the case to a district where it might have been brought, *O'Neal v. Hicks Brokerage Co.*, 537 F.2d 1266, 1268 (4th Cir. 1976).

The United States Supreme Court, in *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), held that a transfer under 28 U.S.C. § 1406(a)—(improper venue in forum)—may be made by a court which is without personal jurisdiction over the defendants. The *Goldlawr* court found that the problem which § 1406(a) sought to avoid was:

"plaintiff's losing a substantial part of its cause of action under the statute of limitations because it made a mistake in thinking that the respondent corporations could be 'found' or that they 'transact . . . business' [in the forum]." 369 U.S. at 466, 82 S.Ct. at 915.

*A fortiori*, where a plaintiff would lose his entire cause of action because of a dismissal when all other states' statutes of limitation have now run,[41] this court sees strong policy reasons for ordering a transfer.

The opposition argument to a transfer under § 1406(a) is that it allows a plaintiff who possibly could not maintain suit in South Carolina federal court—(due to a lack of South Carolina personal jurisdiction)—nor directly in Georgia federal court—(due to the Georgia statute of limitations)—to arrive at his intended destination through the side door of a § 1406(a) transfer.[42] The § 1406(a) transfer, when construed under

---

**38.** Defendant, Proctor & Schwartz, has conceded amenability to service of process in that district.

**39.** Dilliard, The Spirity of Liberty, XXV (1960).

**40.** Under the state's *lex loci delicti* rule, *Gattis v. Chavez*, 413 F.Supp. 33, 35 (D.S.C.1976), the application of Georgia's substantive law, along with South Carolina's forum selected statute of limitations, would be required.

**41.** The record does not reveal whether at the time plaintiff instituted suit in this court, he could have obtained personal jurisdiction over the defendants in other forums before their respective statutes of limitations ran out.

**42.** Defendants obviously subscribe to the viewpoint of Mr. Justice Frankfurter, dissenting in *Hughes v. Fetter*, 341 U.S. 609, 621, 71 S.Ct. 980, 987, 95 L.Ed. 1212 (1951), "There is no need to be 'more Roman than the Romans.'"

the *Van Dusen v. Barrack, supra,* and *Gold-lawr, Inc. v. Heiman, supra,* rationales, provides a classic example of what the French call "depecage", rule-splitting engendered by choice of law principles. The questions raised here are not entirely free of doubt but they require resolution in the transferee district, not in this forum.

While it is true that *Van Dusen v. Barrack* dealt with a convenience transfer at the request of the defendant and did not discuss whether "the same considerations would govern if plaintiff sought a transfer under § 1406(a)" (376 U.S. at 640, 84 S.Ct. at 821), several courts have held that a § 1406(a) transfer carries with it the law of the transferor even where the transferor court was without personal jurisdiction. For instance, in *Mayo Clinic v. Kaiser,* 383 F.2d 653 (8th Cir. 1967), cited in *O'Neal v. Hicks Brokerage Co.,* 537 F.2d 1266 (4th Cir. 1976), the court held, in an action transferred from Illinois federal court to Minnesota federal court on plaintiff's motion, after a determination of lack of personal jurisdiction over the defendants, that the Illinois statute of limitations would govern and that it was tolled by the commencement of the Illinois action.[43] The opposite result has been reached in some cases where the plaintiff *deliberately* brings suit in a forum where he has no hope of obtaining personal service in order to be in a position to move for a change in venue to a district where his suit would have been barred by the transferee statute of limitations when filed in the transferor district. *See Skilling v. Funk Aircraft Co.,* 173 F.Supp. 939 (W.D. Mo.1959); *cf. Viaggio v. Field,* 177 F.Supp. 643 (D.Md.1959); *but see Turner v. McClain,* 459 F.Supp. 898, 901 (E.D.Ark. 1978).[44] This case is clearly not a case of deliberate misfiling, because, as the previ-ous portions of this opinion make clear, there is good reason for plaintiff to have anticipated successful service of process on the defendants here.

As pointed out above, this court clearly has power to transfer this cause to the Georgia federal district court, *Goldlawr v. Heiman, supra;* that court must decide whether to accept South Carolina law in the matter. (See Footnote 44, *supra*).

While it may seem unfair for this court to send the Georgia federal district court such a "Pandora's box" of conflict of laws issues, it is a necessary factor of the federal court system that justice be served by such a transfer mechanism. In the event that the Court of Appeals for the Fourth Circuit should reverse this court on its jurisdictional rulings, the court would transfer this action to the Northern District of Georgia, Rome Division.

While many issues have been discussed herein and numerous facts have been distilled from the record, the court has attempted to resolve each issue on the basis of fundamental fairness to all parties and the dictates of our federal system of jurisprudence. While the opinion is longer than originally contemplated, extensive detail has been deemed necessary to explain the court's conclusions on issues forcibly contested by able counsel for both sides. As was said long ago in a very different context:

> "Neither party expected for the war the magnitude or the duration which it has already attained. . . . Each looked for an easier triumph, and a result less fundamental and astounding."[45]

For the reasons heretofore set forth, it is

ORDERED, that the motions of the defendants to dismiss are denied on all

---

43. *See also, Taylor v. Love,* 415 F.2d 1118 (6th Cir. 1969).

44. For a recent discussion of the issues to be faced by the transferee court, *see Schreiber v. Allis-Chalmers Corp.,* 448 F.Supp. 1079, 1083–85 (D.Kan.1978). A reading of that opinion discloses that the Kansas federal district court there was openly hostile to plaintiff's counsel's practice of "resurrecting a claim 'stale' in Kansas", (448 F.Supp. at 1082). The Kansas court (transferee) predicting that Mississippi (trans-feror) would abandon *lex fori* in the case under consideration, held that it was not obligated to accept the longer Mississippi statute of limitations. This question is, of course, reserved here for decision by the Georgia federal district court.

45. A. Lincoln, Second Inaugural Address quoted in Kennedy, *Judge Frank M. Johnson, Jr.,* (1978).

grounds; and the court contingently orders, in the event its jurisdictional rulings are overturned, that this case shall be transferred, pursuant to 28 U.S.C. § 1406(a), to the Northern District of Georgia, Rome Division.

IT IS FURTHER ORDERED, since this decision involves controlling questions of law as to which there are substantial grounds for different opinion, and immediate appear from this Order may materially advance the ultimate termination of this litigation, that the defendants are hereby granted the right to seek immediate relief, if they be so advised, in the Court of Appeals for the Fourth Circuit, (28 U.S.C. § 1292(b)), and, pending the seeking of such relief, further proceedings in this court are hereby stayed.

AND IT IS SO ORDERED.